## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LINDA NAPIER,

      Plaintiff,                            Case No.
                                               Hon.

v.

SUBURBAN OF ANN ARBOR, LLC, a domestic limited liability
company,
SUBURBAN EMPLOYEE SERVICES, LLC, a domestic limited liability
company,
SUBURBAN EMPLOYEE COLLECTION LLC, and
MIKE MOSSER, in his corporate and individual capacities,

      Defendants.

---

THOMAS R. WARNICKE (P47148)
Law Offices of Thomas R. Warnicke, PLLC
Attorney for Plaintiff
16291 W. 14 Mile Road, Suite 21
Beverly Hills, MI 48025
(248) 930-4411
tom@warnickelaw.com

---

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Linda Napier, by and through her attorneys, the Law Offices

of Thomas R. Warnicke, PLLC, for her Complaint against Defendants, states

and alleges the following:

## **JURISDICTION AND VENUE**

1.      This action is brought pursuant to the Americans with Disability
Act of 1990, 42 U.S.C. § 12101, *et seq.,* as amended by the ADA
Amendments Act of 2008, Pub L No 110-325, 122 Stat 3553
(2008) (effective January 1, 2009), (hereinafter referred to as the
"ADA"); the Michigan Persons with Disabilities Civil Rights Act
("PDCRA") and for other violations of state law.

2.      This Court has jurisdiction over this action pursuant to 42 U.S.C. §
2000e-5, and supplemental jurisdiction pursuant to 28 U.S.C. §
1367.  The court also has jurisdiction pursuant to 28 U.S.C. §§
451, 1331, 1337, 1343, and/or 1345.

3.      Declaratory, injunctive and other appropriate relief, including
monetary, is sought pursuant to each of the aforementioned Acts.

4.      Plaintiff, Linda Napier, is and at all times relevant hereto been a
resident and citizen of the county of Washtenaw, state of
Michigan, and within the jurisdiction of this court.

5.      Upon information and belief, Defendants, SUBURBAN OF ANN
ARBOR, LLC, SUBURBAN EMPLOYEE SERVICES, LLC, and
SUBURBAN EMPLOYEE COLLECTION LLC (hereinafter
referred to collectively as "Defendant Suburban") are domestic

limited liability companies, with its principal place of business, nerve center and headquarters in the city of Troy, county of Oakland, state of Michigan, and within the jurisdiction of this Court.

6. Upon information and belief, the members of Defendant Suburban are citizens and residents of the state of Michigan.

7. Defendant Suburban is a collection of car dealerships that do business throughout Michigan, including within the jurisdiction of this Court.

8. Defendant, Mike Mosser, was employed in a Management position by Defendant Suburban at all times relevant hereto. Upon information and belief, Defendant Mike Mosser was and is a citizen and resident of the state of Michigan during all relevant times hereto.

9. Venue and jurisdiction is proper in this Court pursuant to Federal Question Jurisdiction (violation of the ADA); as well as because Defendants Suburban and Defendant Mosser engage in business throughout the jurisdiction of this Court; and the operative facts giving rise to the claims set forth herein took place within the jurisdiction of this Court.

10. Additionally, this Court has pendant jurisdiction over Plaintiff's state law claims.

11. Declaratory, injunctive and other appropriate relief, including monetary damages, is sought in an amount in excess of $75,000.

12. On November 10, 2018, Plaintiff filed a charge of discrimination against Defendant(s), a copy of which is attached hereto as **Exhibit A** and is incorporated by reference.

13. Plaintiff received a right to sue letter from the EEOC, a copy of which is attached hereto as **Exhibit B** and filed this instant action within 90 days of the date of Plaintiff's receipt of the right to sue.

## GENERAL ALLEGATIONS AND STATEMENT OF CLAIMS

14. Plaintiff began here employment with Defendant Suburban at the Suburban Chevy Cadillac dealership on Jackson Road in Ann Arbor, Michigan on or about May 2014.

15. Plaintiff' position was an Internet Sales Associate and Special Finance Associate.

16. Plaintiff was a diligent and hard-working employee for Defendants.

17. Plaintiff routinely received satisfactory or above employment evaluations and pay rate increases.

4

18.     In or about July of 2015, Plaintiff was told that her position was being eliminated by Defendant Suburban.

19.     Defendant Suburban then offered to transfer Plaintiff to the Plymouth location.

20.     Plaintiff accepted Defendant Suburban's transfer proposal.

21.     In or about July 2015, Plaintiff was transferred to Defendant Suburban's Plymouth location.

22.     On or about October 2016, Defendant Mosser contacted Plaintiff and offered her a new position at the Ann Arbor location.

23.     Plaintiff accepted Defendant Mosser's offer and they set a start date of November 1, 2016.

24.     Unfortunately, before she could start her new position, Plaintiff started to experience violent tremors and on October 26, 2016, she went to the emergency room at U of M Hospital.

25.     Plaintiff was subsequently diagnosed with Parkinsonism which was determined to likely be triggered by stress.

26.     Plaintiff was instructed to stop some of her medications that she was already taking for her Bipolar Disorder.

27.     Plaintiff had informed Defendant Suburban that she had Bipolar Disorder before October 26, 2016.

28.   Plaintiff was also instructed by her doctor to take a medical leave to "de-stress" and adjust to the new medication regimen.

29.   Plaintiff immediately called Mark Young (who was going to be her manager at the Ann Arbor location) to tell him about her situation and let him know that she would not be able to start in November as previously discussed.

30.   Plaintiff explained to Mark Young exactly what the problem was, Parkinsonism caused by stress and possibly made worse by her anti-psychotic meds that had been prescribed to treat her Bipolar Disorder.

31.    Mark Young was very sympathetic to Plaintiff and told her that she needed to take care of herself.

32.   Plaintiff then asked if she could check in when she was back to work to see if the job was still available, to which Mark responded, "absolutely."

33.   Plaintiff provided her documentation from her doctor to Defendant Suburban and they helped Plaintiff set up her medical leave.

34.   Plaintiff was off work for about 6 weeks while utilizing short-term disability and FMLA benefits.

35. On or about December 2016, when Plaintiff was able to return to work, the position in Ann Arbor was no longer available so she returned to her position at the Plymouth location.

36. On or about October 2017, Defendant Mosser reached out to Plaintiff once again to offer her a position at the Ann Arbor location.

37. Plaintiff accepted the offer and was informed that Mina Boles would be her supervisor and that she would be working with an employee named "Jenna."

38. Plaintiff was never told that "Jenna" was actually Jenna Mosser, Defendant Mosser's daughter.

39. Plaintiff and Jenna Mosser got along fine as co-workers.

40. However, Plaintiff knew Jenna had a tendency to over-react to certain things due to her own Bipolar Disorder, so Plaintiff decided to divulge her diagnosis to Jenna.

41. Jenna appeared to be very understanding about it, for which Plaintiff was relieved.

42. On or about December 2017, Plaintiff and others were told that all employees had to work "open to close" for the whole duration of the last week of the year.

43.   Plaintiff immediately brought Defendant Mosser's attention to the fact that she was unable to work that many hours due to her disability, which he and Defendants had been aware of since her incident in October 2016.

44.   Plaintiff explained to Defendant Mosser that adhering to a normal routine with a regular sleep pattern was vital in the management of Bipolar Disorder and that any deviation from that routine could trigger manic episodes.

45.   Defendant Mosser's response to Plaintiff was "I don't care" and that he had "144 employees and I expect the same out of everybody."

46.    Plaintiff was understandably upset and she and Defendant Mosser ended up in a very loud argument during which he told her that if she continued to raise her voice she would be fired, despite raising his voice, himself.

47.   The next day, Plaintiff was distraught that she was not going to be able to perform all the hours requested during that week because of her disability and decided to, once again, remind Defendant Mosser of her diagnosis and limitations.

48.    Plaintiff requested reasonable accommodations for a regular schedule.

49.    Defendant Mosser refused to consider Plaintiff's disability and request for accommodations.

50.    Further, Defendant Mosser again responded "I don't care" and again referenced the "144 employees" he has working for him.

51.    Plaintiff tried to give Defendant Mosser documentation regarding her disability.

52.    However, Defendant Mosser refused to take any of her documentation and told her "I don't need documentation from you."

53.    Defendant Mosser also strongly implied that if Plaintiff did not work the expected hours she would lose her job.

54.    Plaintiff felt that she had no choice but to comply as she could not afford a reduction in her income, nor the loss of health insurance.

55.    Therefore, and to her detriment, Plaintiff worked about 50 hours that week.

56.    During that time Plaintiff was only able to sleep 4-5 hours each night, as opposed to the 8-10 hours that she required.

57.   Due to the unexpected schedule change, Plaintiff was subjected to adverse side effects including restlessness, irritability, inability to concentrate, edginess, fatigue, nausea, and a general feeling of malaise that she could not get over for weeks after.

58.   On or about January 2, 2018, and still suffering from the ill affects of working so many hours beyond her ability, Plaintiff did some research to determine what her rights were.

59.   As a result of her research, Plaintiff wrote a Disclosure of Disability letter and submitted it via email to Defendant Mosser, Cadillac Sales Manager, Mina Boles and Office Manager, Debbie Noble.

60.   Later that day, Defendant Mosser confronted Plaintiff about her supposed lack of hours during the work week.

61.   Plaintiff did not understand what he was talking about as she consistently worked a 40-41-hour work week and instead of answering, she decided to ask Defendant Mosser if he had read her email that included the Disclosure of Disability.

62.   Defendant Mosser claimed he had not seen it and proceeded to read it in front of her.

63.   Plaintiff's Disclosure of Disability letter was not received very
      well by Defendant Mosser, as he was visibly angry and shocked,
      not understanding why she would send that to him, even to the
      point of questioning Plaintiff  "Why would you do such a thing?"

64.   As a direct result of Defendant Mosser's reaction to her letter,
      Plaintiff began to experience increasingly out-of-control symptoms
      of her Bipolar Disorder, but felt that she could not discuss the
      situation with Defendant Mosser based on his hostile reaction to
      her disclosure of her disability.

65.   The only person who tried to work with Plaintiff when she needed
      to take time off due to her disability was her supervisor, Mina
      Boles, but he could only allow a day, or half a day, here and there.

66.   A few days later, on or about January 23, 2018, Defendant Mosser
      inexplicably bought Plaintiff a lumbar support desk chair without
      consulting Plaintiff.

67.   Plaintiff was confused, until she realized that Defendant Mosser
      must be responding to one of the less serious physical disabilities
      she had included on her disclosure and assumed it was his way of
      trying to "accommodate" her as the ADA instructs employers to do
      upon receipt of the disability disclosure.

68. Unfortunately, Defendant Mosser never consulted Plaintiff about the back issue and what type of chair would benefit her and if he had she would have told him that listing her other, less serious issues, was her way of trying to present him with the big picture and how the Bipolar Disorder impacts all of it.

69. Nonetheless, Plaintiff did send Defendant Mosser an email to thank him for the purchase because she did not want to seem ungrateful.

70. Despite this superficial effort to accommodate Plaintiff, Defendant Mosser again started to pressure Plaintiff about her hours, which had never been brought to her attention as an issue before.

71. Sometime in February, 2018 and shortly after Plaintiff's disclosure of her disability, Mina Boles approached Plaintiff and accused her of only working 35-37 hours a week instead of 40 hours a week.

72. Plaintiff denied this and showed Mr. Boles a print out of her hours, which clearly showed consistent weeks of 40-41 hours.

73. Plaintiff was incredulous when Mr. Boles informed her that Defendant Mosser told him that he had told Plaintiff that she had to work 45-46 hours.

74.   Plaintiff denied it as untrue and was disturbed that instead of reducing hours, they were once again trying to get her to work more hours.

75.   Plaintiff discussed the situation with co-worker Jenn Wallace, only to find out that Defendants had been deducting an hour a day for lunch breaks that Plaintiff never took.

76.   When Plaintiff spoke to Mr. Boles about it, he told her that maybe she should be taking the lunch breaks because "with the bipolar it night help to take a break", which was hostile, threatening and insulting to Plaintiff.

77.   Plaintiff was never told that Defendants would be deducting an hour a day out of her pay for lunch, nor was this practice ever referred to in any Employee Handbooks or Rules.

78.   The only time meals are referred to in Defendant Suburban's Employee Handbook is under the paragraph titled "Breaks" which states:

> "Meal periods and rest breaks may be taken at times scheduled by your manager, they should not disrupt the work flow or interfere with customer service. An unpaid *meal period* of up to 60 minutes normally is granted if the shift is five hours or longer."

79.    There is no mention of an automatic deduction for lunch periods in Defendant Suburban's Employee Handbook, nor was Plaintiff ever informed that an automatic deduction for lunch was policy.

80.    As a matter of fact, the handbook clearly states that the lunch break can take "up to" 60 minutes, which would require documentation of how long an employee's lunch break was actually taken for the appropriate amount of time to be taken out, which was never done.

81.    Plaintiff realized and then confirmed that Defendants had been unlawfully deducting 5 hours a week for her lunch breaks, even though she did not take a lunch break and was a salaried employee.

82.    Around the same time, Plaintiff's relationship with Jenna Mosser became strained for no reason and every time Plaintiff asked Jenna if she had done anything to upset her, Jenna would always reply that everything was "fine."

83.    However, there was one argument that they had and when Plaintiff tried to discuss it with Jenna she responded "Linda, I am not out to get you, it is all in your head", a comment that was completely inappropriate directed towards someone that struggles with a mental illness.

84. Plaintiff became suspicious that Jenna and her father, Defendant Mosser, were retaliating against her, trying to undermine her and gather information that could be used against Plaintiff and as fabricated grounds to terminate.

85. Plaintiff's fears were later founded when she received a copy of her employee file and discovered emails from Jenna to her father, Defendant Mosser, criticizing Plaintiff's work.

86. During this time, Defendant Mosser asked Plaintiff multiple times whether Plaintiff was happy there or did she want to quit.

87. Defendant Mosser also stated to Plaintiff that "at some point this is either going to be not working out for me or not working out for you."

88. On or about February 2018, Plaintiff and Jenna had an argument over a customer file and because Plaintiff thought she may have overreacted she sent two emails and a text to Jenna apologizing for her part in the situation and explaining her behavior.

89. Plaintiff began to realize that Jenna was purposefully setting her up and prodding her to make her lose her temper, which was easy to do to someone with Bipolar Disorder and also something Jenna was very much aware of.

90. The next morning, Plaintiff arrived at work and was immediately called into her manager's office where Jenna also sat waiting.

91. Jenna participated in the meeting by disparaging Plaintiff and accusing her of not knowing what she was doing and being incompetent.

92. Jenna's behavior and obvious retaliation against Plaintiff became extremely disconcerting to Plaintiff, causing her even more unbalance with her illness.

93. Plaintiff finally reached out to her Psychiatrist about taking another leave to get herself back to "normal" again and was making plans to do so.

94. Meanwhile, Plaintiff noticed that Jenna began to monitor Plaintiff's work and started to compare her work out-put to Plaintiff's.

95. As a matter of fact, Plaintiff later discovered that Jenna had also been keeping track of her customer calls, even emailing this information to her father, Defendant Mosser.

96. On or about March 2018, Plaintiff discovered that Jenna had taken over some of her client accounts, taking credit for all of them.

97. Although there were no customers in the showroom at the time, Plaintiff was visibly angry when she confronted Jenna about the offense and potential loss of income and admittedly used profanity.

98. Plaintiff was immediately written up for improper conduct by Defendant Mosser, her first disciplinary action since her employment with Defendants.

99. Plaintiff informed Defendant Mosser that Jenna had used the same language earlier that day, however, Jenna did not receive any disciplinary action.

100. Plaintiff also pointed out that Jenna and other employees also used profanity without being written up.

101. Plaintiff pointed out to Defendant Mosser that his failure to discipline Jenna and others for the same offense was a double standard.

102. Defendant Mosser became angry with Plaintiff and sent her home, telling her that if she wanted to keep her job she could come back Saturday.

103. On or about Saturday, March 31, 2018, Plaintiff showed up for work as instructed and shortly after was summoned to Defendant Mosser's office.

104. Defendant Mosser asked Plaintiff what she was thinking.

105. Plaintiff was confused, so she responded "Nothing".

106. So, Defendant Mosser asked her "Really? Nothing?"

107. Plaintiff answered "Well, I need my job".

108. Defendant Mosser replied "that's all you're thinking, really?

109. Plaintiff said "Yes".

110. Then Defendant Mosser cruelly responded "that's too bad cause we're letting you go."

111. Plaintiff was stunned and dismayed as she had done exactly as Defendant Mosser had asked her to do if she wanted to "keep her job."

112. Plaintiff had barely started cleaning out her desk when Defendant Mosser came over and angrily yelled at her, "Linda, get out of the building NOW!"

113. The purported reason for Plaintiff's termination was the one incident, days earlier, that she had received her only disciplinary action for.

114. However, Defendants' reason for Plaintiff's termination was a blatant pretext for their discrimination against Plaintiff's disability and retaliation for asking for accommodations.

115. Upon information and belief, Defendant Suburban has a policy requiring progressive discipline.

116. Defendant Suburban did not terminate Plaintiff pursuant to a progressive discipline policy.

117. As a direct and proximate result of Defendants' unlawful actions, Plaintiff has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliation and embarrassment; mental and emotional distress; anxiety, indignation, depression, sleeplessness, weight fluctuation, loss of the ordinary pleasures of everyday life, inability to socialize and enjoy her community, including the right to a gainful occupation of choice. Plaintiff is also entitled to additional compensatory and punitive damages.

## COUNT 1

## VIOLATION OF THE AMERICAN WITH DISABILITIES ACT

118. Plaintiff repeats and re-alleges the allegations set forth above.

119. During Plaintiff's employment with Defendants, Plaintiff had a disability recognized by the ADA.

120. Defendants were aware of Plaintiff's disability.

121.  Plaintiff informed Defendants of her disability during her employment.

122.  Plaintiff also opposed an act or practice made unlawful by the Americans with Disability Act of 1990, 42 U.S.C. § 12101, *et seq.,* as amended by the ADA Amendments Act of 2008, Pub L No 110-325, 122 Stat 3553 (2008) (effective January 1, 2009).

123.  Plaintiff requested reasonable accommodations for her disability during her employment with Defendants.

124.  Defendants failed and refused to provide Plaintiff with reasonable accommodations.

125.  Plaintiff engaged in protected activity by requested her reasonable accommodations.

126.  Plaintiff suffered from an adverse employment decision by Defendants because of her disability and/or for her request for accommodations.

127.  Defendants perceived Plaintiff as being disabled.

128.  Plaintiff has been subjected to unlawful harassment, retaliation, and ultimately termination by Defendants, because of her disability, all of which is unlawful under the ADA.

129.   During her employment with Defendants, Plaintiff engaged in a protected activity under The Americans with Disabilities Act, including but not limited to requesting a reasonable accommodation(s) under the Act for a co-worker.

130.   There is a causal connection between Plaintiff's protected activities and Defendants' actions with regard to Plaintiff's employment, including her termination.

131.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliation and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life, including the right to a gainful occupation of choice.  Plaintiff is also entitled to additional compensatory and punitive damages.

132.   During Plaintiff's employment with Defendants, Plaintiff was subjected different terms and conditions of employment, specifically retaliation and harassment as compared to other similarly situated co-workers who had not participated in protected activity under the Act.

133.    Plaintiff's participation in protected activity under the Act was at least one factor that made a difference in Defendants' actions and employment decisions regarding Plaintiff, including but not limited to her termination.

134.    Defendants' treatment toward and termination of Plaintiff was also in violation of the ADA.

135.    If not for Plaintiff's participation in protected activities, she would not have been retaliated against or terminated.

136.    Defendants' actions were made in an intentional disregard for Plaintiff's rights.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against Defendants, jointly and severally, as follows:

a.    Compensatory damages in whatever amount Plaintiff is found to be entitled, including but not limited to past, present and future pain and suffering, physical, mental and emotional distress;

b.    Exemplary and/or punitive damages in whatever amount Plaintiff is found to be entitled;

c.    Judgment for lost wages, past and future, in whatever amount Plaintiff is found to be entitled;

d.      An award for the value of lost fringe and pension benefits, past

and future;

e.      An award of interest, costs, and reasonable attorney fees;

f.      An injunction prohibiting any further acts of retaliation or

discrimination; and

g.      Whatever other equitable relief appears appropriate at the time

of final judgment, including but not limited to reinstatement.

## COUNT 2
## VIOLATION OF MICHIGAN'S PERSONS WITH DISABILITIES CIVIL RIGHTS ACT
### MCL 37.1101 *et seq.*
### (Discrimination and Retaliation)

137.   Plaintiff repeats and reincorporates set forth above.

138.   At all times pertinent hereto, Defendants has at least 15 employees

and was Plaintiff's employer within the meaning of the Michigan

Persons with Disabilities Civil Rights Act (PDCRA).

139.   The individual named Defendants were Plaintiff's "employer"

within the meaning of the PDCRA.

140.   Plaintiff was a disabled person within the meaning of the PDCRA.

141.   Plaintiff was discriminated against by Defendants because of her

disability and/or her perceived disability.

142. At all times relevant hereto, Plaintiff was qualified for her position with Defendants.

143. Moreover, Plaintiff was able to perform the essential functions of her job, with or without reasonable accommodations.

144. Such reasonable accommodations included, but were not limited to, allowing Plaintiff to maintain a regular 40-hour work week.

145. Providing such reasonable accommodations would not have resulted in any hardship to Defendants.

146. Plaintiff suffered an adverse reaction when she was retaliated against and ultimately terminated by Defendants, all due to her disability.

147. Defendants knew or had reason to know of Plaintiff's disability.

148. As a direct and proximate result of Defendants' unlawful actions, Plaintiff has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliation and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life, including the right to a gainful occupation of choice. Plaintiff is also entitled to additional compensatory and punitive damages.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against Defendants, jointly and severally, as follows:

a.  Compensatory damages in whatever amount Plaintiff is found to be entitled, including but not limited to past, present and future pain and suffering, physical, mental and emotional distress;

b.  Exemplary and/or punitive damages in whatever amount Plaintiff is found to be entitled;

c.  Judgment for lost wages, past and future, in whatever amount Plaintiff is found to be entitled;

d.  An award for the value of lost fringe and pension benefits, past and future;

e.  An award of interest, costs, and reasonable attorney fees;

f.  An injunction prohibiting any further acts of retaliation or discrimination; and

g.  Whatever other equitable relief appears appropriate at the time of final judgment, including but not limited to reinstatement.

## COUNT 3

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

149.   Plaintiff repeats and reincorporates by reference the above stated paragraphs.

150.   As set forth above, Plaintiff was subjected to extreme and outrageous conduct by Defendants; Defendants' conduct was intentional and reckless; and Defendants' conduct caused Plaintiff severe emotional distress.

   **WHEREFORE**, Plaintiff requests that this Court enter judgment against Defendants as follows:

   a.   Compensatory damages in whatever amount Plaintiff is found to be entitled, including but not limited to past, present and future pain and suffering, physical, mental and emotional distress;

   b.   Exemplary and/or punitive damages in whatever amount Plaintiff is found to be entitled;

   c.   Judgment for lost wages, past and future, in whatever amount Plaintiff is found to be entitled;

   d.   An award for the value of lost fringe and pension benefits, past and future;

e.      An award of interest, costs, and reasonable attorney fees;

f.      An injunction prohibiting any further acts of retaliation

or discrimination; and

g.      Whatever other equitable relief appears appropriate at the

time of final judgment.

Respectfully submitted:

/s/ Thomas R. Warnicke
Thomas R. Warnicke (P47148)
Law Offices of Thomas R. Warnicke, PLLC
Attorneys for Plaintiff
16291 W. 14 Mile Road, Suite 21
Beverly Hills, MI 48025
(248) 930-4411
tom@warnickelaw.com

## **JURY DEMAND**

Plaintiff hereby demands a jury trial in this action.


Respectfully submitted:

/s/ Thomas R. Warnicke
Thomas R. Warnicke (P47148)
Law Offices of Thomas R. Warnicke, PLLC
Attorneys for Plaintiff
16291 W. 14 Mile Road, Suite 21
Beverly Hills, MI 48025
(248) 930-4411
tom@warnickelaw.com

# EXHIBIT 1

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 471-2019-00177 |

| Michigan Department Of Civil Rights | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Linda L. Napier | (810) ███████ | |

| Street Address | City, State and ZIP Code |
|---|---|
| ████████████ Dexter, MI 48130 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| SUBURBAN COLLECTION/ SUBURBAN CHEVY CADILLAC | 101 - 200 | (734) 663-3321 |

| Street Address | City, State and ZIP Code |
|---|---|
| 3515 JACKSON RD, Ann Arbor, MI 48103 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☐ RETALIATION   ☐ AGE   ☒ DISABILITY   ☐ GENETIC INFORMATION
☐ OTHER (Specify)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 12-01-2017 | 03-31-2018 |

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

On or about May 19, 2014, I was hired as an Internet Sales Assistant and Special Finance Assistant by the above-named employer. The last position that I held was Internet Sales Assistant.

In or around December 2017, I requested to work a reduced schedule during the holiday season as a reasonable accommodation and disclosed my disability to the employer. The employer denied my accommodation request. After disclosing my disability, my relationship with management changed. The employer subjected me to increased scrutiny and hostility that I believe is due to my disability. In addition, my coworker, who is also the manager's daughter, subjected me to poor treatment. She received preferential treatment. On or about March 31, 2018, I was discharged.

I believe I was denied a reasonable accommodation and discharged due to my disability, in violation of the Americans with Disabilities Act of 1990, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 11/10/2018          *Linda Napier*<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year)<br>November 10, 2018 |

JENNIFER S. DIXON
NOTARY PUBLIC - STATE OF MICHIGAN
My Commission Expires Jul 13, 2022
Washtenaw

# EXHIBIT 2

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: **Linda L. Napier**

**Dexter, MI 48130**

From: **Detroit Field Office
477 Michigan Avenue
Room 865
Detroit, MI 48226**

| | |
|---|---|
| ☐ | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 471-2019-00177 | **Michael M. Hourani,** Investigator | **(313) 226-4602** |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

## - NOTICE OF SUIT RIGHTS -

(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Michelle Eisele,*

**Michelle Eisele,
District Director**

12/7/18 (Date Mailed)

Enclosures(s)

cc:
**Suzanne Bartos
Cummings McClorey Davis & Acho
17436 College Parkway
Livonia, MI 48152**